**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO**

Civil Action No.

PRESTON & ASSOCIATES INTN'L, P.C.,

       Plaintiff,

v.

WELLS FARGO & COMPANY, and
WELLS FARGO BANK, N.A.

       Defendants.

---

**COMPLAINT**

---

COMES NOW the Plaintiff and alleges:

**JURISDICTION**

1.  This Complaint arises from the acts and omissions of the Defendants in the District of Colorado, and, in interstate commerce.

2.  The adjudication of the Defendants' acts and omissions requires adjudication of federal questions, including, but not limited to, the Antitrust Laws of the United States.

3.  Plaintiff is a domestic corporation in the State of Colorado, and, is domiciled in the State of Colorado.

4.  The Defendants are not a citizen or resident of the State of Colorado and are not domiciled in the State of Colorado; the Defendants are domiciled in the State of South Dakota.

5.  Complete diversity exists between the Plaintiff and the Defendants.

6.  The amount in controversy exceeds $75,000.00.

7.  This Court has original jurisdiction to adjudicate these matters under 28 U.S.C. § 1331 and 1332 (2009).

8.  This Court has ancillary and pendent jurisdiction over the Plaintiffs' claims to the extent they arise other than under the laws of the United States.

**VENUE**

9.  This cause of action pertains to the Defendants' acts and omissions, including breach of contract, and, breach of implied covenants of fair-dealing, resulting in injury to the Plaintiff, in the State and District of Colorado.  These are matters of state and federal law, and, arise principally from the Defendants' unlawful conduct in the assessment of overdraft fees, and, to maximize their revenues from overdraft fees, the failure to post deposits on a timely basis, or, pay negotiable instruments as required under state and federal law.

10. Venue in the United States District Court of the District of Colorado is vested under 28 U.S.C. § 1391(a) & (b) (2009).

**GENERAL ALLEGATIONS of FACT**

1.  Plaintiff entered into various agreements from 1992, to the present, with the Defendants, for the provision of banking services.

2.  The banking services carried with them the implied covenants of good faith and fair dealing in the provision of banking services the Defendants were to provide to the Plaintiff;

3.     This is an action for restitution and disgorgement of profits gained by the Defendants as a result of wrongfully taking overdraft fees from the Plaintiffs' checking accounts, and, wrongfully obstructing and delaying the accessibility of Plaintiff's funds.

4.     Plaintiff also seeks remedies for Defendants' actions in increasingly the likelihood of assessing these charges by identifying, delaying and publishing inaccurate "available balance" information to Plaintiff.

5.     The true names and capacities of defendants sued herein as DOES 1 through 125, inclusive, are currently unknown to Plaintiff, who therefore sues such defendants by such fictitious names.  Each of the defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein.  Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of the defendants designated herein as DOES when such identities become known.

6.     Based upon information and belief, plaintiff alleges that at all times mentioned in this Complaint, each and every defendant was acting as an agent and/or employee of each of the other defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission and

consent of each of the other defendants. In addition, each of the acts and/or omissions of each defendant alleged herein were made known to, and ratified by, each of the other defendants.

7. Based on information and belief, the insufficient funds charges incurred by Plaintiff are representative of hundreds of millions of dollars of insufficient overdraft fees that WELLS FARGO assessed (assesses) its customers and automatically deducted (deducts) from their checking accounts when there were (are) sufficient funds in their accounts at the time of the transaction.  This is an egregious wrongful taking of customers' money from their checking accounts because WELLS FARGO is using computer technology, similar to gaming programs employed by the casino industry, to insure that WELLS FARGO minimizes the balance in customer accounts, and, maximizes its opportunity to assess, unilaterally, NSF fees.

8. In addition to assessing NSF fees as an unauthorized taking of the Plaintiff's property, WELLS FARGO also charges a "returned check fee" of $35.00 for each of the Plaintiff's checks presented against a balance which WELLS FARGO has intentionally and willfully minimized to maximize its revenue from NSF fees and "returned check fees."

9.     In addition to assessing NSF fees, and, "returned check fees", WELLS FARGO also willfully delays posting deposits to the Plaintiff's account for the purpose of minimizing the balance in Plaintiff's account, and, maximizing WELLS FARGO'S control and profits over the outstanding balance prior to, eventually, posting it to the Plaintiff's account.

10.     As "plausible deniability" for this conduct, WELLS FARGO uses "security" as an excuse for its conduct; in truth, and in fact, the "security" issues WELLS FARGO advances as justification for its conduct arises from its own surreptitious manipulation of the Plaintiff's accounts.

11.     WELLS FARGO uses its computer technology to receive information from the Federal Reserve check clearing system, and, the Automated Clearing House [ACH] approximately 24 hours in advance of posting the same information to the customers' accounts (including the Plaintiff); in that 24 hour period, WELLS FARGO reorders and re-sequences transactions so as to maximize its profitability from understating the balance in the Plaintiff's accounts.

12.     There is little, if anything, that a customer can do to meet a shortfall in its account contrived by WELLS FARGO; with the excuse of "security" WELLS FARGO can, and does, delay posting deposits as it

chooses, irrespective of the merits of the deposits, or, the damages resulting to the customer, or, the opportunities WELLS FARGO makes for itself, with its computer programming, to assess its NSF and returned check fees.

13. Based on information and belief, Plaintiff alleges that the insufficient funds charges incurred by Plaintiff are representative of hundreds of millions of dollars of insufficient overdraft fees, and, returned check fees, that WELLS FARGO assessed its customers and automatically deducted from their checking accounts when there were sufficient funds in their accounts at the time of the transaction.  This is an especially egregious wrongful taking of customers' money from their checking accounts because WELLS FARGO programmed its computers to contrive artificially low balances in Plaintiff's account and knew, at the time it reordered the transactions and assessed the fees, there were sufficient funds in the account to cover the transactions.

14. The advanced computer programming techniques of WELLS FARGO are so aggressive and dishonest that they produce instances in which WELLS FARGO assesses NSF fees (further artificially lowering the balances in Plaintiff's account) even when their own programming shows a positive balance in the account;

7

15.   This is loosely referred to in industry as "cooking the books."  In technical terms, WELLS FARGO is using its computers to "past post" information so that it can maximize its opportunities to assess $70.00 per check that is presented against customers' checking account balances, which it has artificially reduced, so that it can maximize its profit taking from NSF fees and "return check fees."

16.   These programming techniques are almost undetectable, except to insiders at WELLS FARGO.

17.   There is no "paper trail" because WELLS FARGO's computerized programming does not track its re-sequencing of items presented against customer accounts, and, because the computerized "cooking of the books" is volatile, i.e. WELLS FARGO, intentionally, does not release a permanent record of the "cooking" to its customers; WELLS FARGO presents to its customers only a "sanitized" version of the customer's accounts after it has completed its manipulation of the accounts.

18.   A customer can only detect the "cooking of the books" on its account if an anomaly occurs that WELLS FARGO'S programmers did not anticipate.

19.   In the case of the Plaintiff, Plaintiff discovered WELLS FARGO's re-

sequencing of its accounts only through a chance anomaly caused by WELLS FARGO's aggressive programming.

20. Suspecting the re-sequencing in its accounts, the Plaintiff began monitoring WELLS FARGO's account entries.

21. On November 19, 2009, at 9:37 a.m., Plaintiff's computer system recorded a series of entries made by WELLS FARGO's computer, to its account, which showed the re-sequencing (re-ordering) of transactions it normally conceals.

22. On November 12, 2009, WELLS FARGO's aggressive computer programming had caused them to "past-post" or delay posting a $1,400.00 deposit.

23. In "cooking" the entries on Plaintiff's accounts, WELLS FARGO accidentally disclosed that its computer was prospectively programmed to begin assessing NSF fees against customers' accounts, including the Plaintiff's accounts, even though there was, at all times (even with the $1,400.00 past-posted deposit) sufficient funds to cover the outstanding debits being presented against the account.

24. WELLS FARGO's computers posted the following sequence of transactions:

| 11/18/2009 | -13.84 | * | 1927 | CHECK # 1927 |
| 11/18/2009 | -35 | * | | NSF RETURN ITEM FEE |
| 11/18/2009 | -35 | * | | NSF RETURN ITEM FEE |
| 11/18/2009 | -35 | * | | NSF RETURN ITEM FEE |
| 11/18/2009 | -35 | * | | NSF RETURN ITEM FEE |
| 11/18/2009 | -35 | * | | NSF RETURN ITEM FEE |
| 11/17/2009 | -35 | * | | NSF RETURN ITEM FEE |
| | | | | WITHDRAWAL MADE IN A |
| 11/16/2009 | -100 | * | | BRANCH/STORE |
| 11/13/2009 | 350 | * | | ONLINE TRANSFER REF #IBEMM9SJKX FROM BUSINESS |

25.   The above transactions show that WELLS FARGO has deliberately programmed its computers to aggressively assess NSF fees even when items are not being presented against insufficient funds.

26.   Plaintiff is informed, and on that information alleges, that the assessment of NSF and returned check fees in the U.S. banking industry is a lucrative source of unearned revenue for banks such as WELLS FARGO; the industry records that banks, such as WELLS FARGO, generated over $40,000,000,000.00 (Billion) dollars in windfall profits from the assessment of NSF and returned check fees in 2008.

27.   Such revenues represent "windfalls" to the banks that aggressively seek to impose the fees on their customers.

28.   Because the assessment of the fees are aided by WELLS FARGO's computers, and, because they represent a completely automated

process, WELLS FARGO's charging of the fees is grossly disproportionate to any expenses, costs, or, damages it incurs if NSF checks are presented against a customer's account.

29.   It is virtually impossible for a customer to correct the re-ordering or re-sequencing of an account at WELLS FARGO; WELLS FARGO has arranged its "customer service" program in such a way that no customer service representative can "fix" an error in the computer, or, assist a customer in making a deposit to cover an NSF situation, or, prevent the assessment of the NSF fees; WELLS FARGO, in effect, has imposed strict liability on the customer for any situation in which its computers contrive an NSF situation; this is similar to the gaming technology employed by the casino industry, in its computerized slot machines, to insure that the casino (like WELLS FARGO) is certain to prevail in capturing the customer's funds (with some exceptions).

30.   WELLS FARGO has failed to provide notice and make customers aware that they can incur insufficient funds, and, overdraft fees on transactions that, when made, have (or had) sufficient funds in the account to cover the transaction.

31.   WELLS FARGO is one of this country's largest consumer banking companies servicing millions of businesses and consumers

nationwide.  According to a news release issued by WELLS FARGO, a copy of which is attached as EXHIBIT A, WELLS FARGO has captured the largest market share of deposits in the United States (the "relevant geographic market").

32. One of the predatory market practices WELLS FARGO has employed to obtain the inordinately high market share of deposits in the United States is to use misleading advertising to recruit depositors and customers; WELLS FARGO entices the depositors into believing that their funds will be safe in WELLS FARGO because of its on-line policies and computer resources.

33. In truth, and in fact, WELLS FARGO is the most likely entity to violate the security of the customers' funds by its aggressive computer programming and re-ordering of transactions, as well as its intentional practice of withholding and "past-posting" information to its customers, such as the Plaintiff, pertaining to the balances in their accounts.

34. When customers, such as the Plaintiff, rely upon the balance information they provide, it is possible, because of WELLS FARGO'S aggressive computer programming, for the Plaintiff or other customers to incur NSF fees of $70.00 per check presented against an account

that has sufficient funds; this can, and does, result in the $70.00 per check NSF fees to reduce the balance in the account to the point at which even more of the customer's checks appear to be presented against an insufficient balance, which then triggers WELLS FARGO's computer to assess even more $70.00 per check or debit card NSF fees; WELLS FARGO immediately seizes the $70.00 per NSF transaction fees with not notice to the customer or opportunity for the customer to mitigate damages; WELLS FARGO actually promotes NSF balances in customers' accounts to provide "plausible deniability" for the seizure of the customers' funds.

35.   WELLS FARGO further misrepresents the accuracy and reliability of these published "account balance" or "available balance" information in its marketing materials and customer contractual agreements while encouraging customers to rely on available balance information provided to them by WELLS FARGO in making their account decisions.  Examples of such misrepresentations include:

a.  Welcome to Your New Account Jacket:

"**Gain More Control Over Your Finances With Wells Fargo Online Banking**.  Free online access to your accounts lets you manage your finance any time, anywhere you have Internet access. **Check your account balances and transaction history**."

13

b. Consumer Account Fee and Information Schedule, p. 38:

"**Wells Fargo Online Banking**  Online Banking gives you a convenient and flexible way to manage your finances by providing free online access to your personal accounts. You can view account balances and history, transfer funds and receive monthly statements online."

c. Get your finances into shape with our resources (brochure):

"**Wells Fargo Online Banking with Bill Pay** As a leader in Internet banking, we can help you get fiscally fit by organizing your finances with Online Banking with Bill Pay. This service lets you enjoy managing your money in one place, anytime, anywhere you have Internet access. You can check balances, transfer funds between accounts, view your monthly statement and pay your bills all online."

d. **Checking, Savings, And More (brochure):**

"Online Banking and Bill Pay   Manage your finances anytime, anywhere you have Internet access  View online statements, check balances, transfer funds, and more Pay any company or individual in the U.S. with Online Bill Pay"

e. **Wells Fargo Account Activity Questions (webpage):**

 "Why are my available and ending balances different?  Your available balance is the most current information regarding the funds you have

available for withdrawal, ATM or check Card purchases, or writing checks. It reflects the latest balance based on transactions recorded to your account today including direct deposits, paid checks, withdrawals, and point-of-sale purchases."

36. WELLS FARGO has also failed to provide notice, or disclosure, to customers that the published available balance information it promotes, markets, encourages and advertises as something for the customer to rely on, is inaccurate and can result in insufficient overdraft charges for transaction that are within the amount of the stated available balance published by WELLS FARGO.

37. The legal and factual issues in this case include the following:

a. Whether Defendant WELLS FARGO assessed insufficient overdraft fees for transactions it approved and for which there were sufficient funds in the account at the time of the transaction to cover the cost of the transaction.

b. Whether Defendant WELLS FARGO posted account balances that do not reflect their actual balance, thereby inducing the customers who rely on the inaccurate statement of account balance into overdrafting from their account and resulting in being assessed overdraft fees.

c.  Whether Defendant WELLS FARGO delayed the posting of transactions made by customers using WELLS FARGO's debit card, check card or ATM card so that customers are charged overdraft fees on transactions even though the customers had sufficient funds in their account to cover the transactions when the transactions were entered into.

d.  Whether Defendant WELLS FARGO re-ordered daily the posting of transactions from largest transactions to smallest, thereby increasing the number of overdraft fees customers are assessed. Whether WELLS FARGO charged exorbitant overdraft fee that bears no relationship to the actual cost and risk to WELLS FARGO of paying an NSF item that it had already assessed.

e.  Whether WELLS FARGO created a line of credit for customers to permit them to overdraft from their accounts, thereby assessing the customers overdraft fees.

f.  Whether WELLS FARGO failed to disclose to customers each of the above practices.

g.  Whether WELLS FARGO assessed insufficient funds overdraft fees for transactions which were within the published available balance information at the time of the transaction.

h.  Whether Defendant WELLS FARGO promotes, markets, encourages and advertises the available balance through ATM machines, Online, Bank Statements, In-Store and Telephone as something for the customer to rely on, which is inaccurate and can result in insufficient overdraft charges for transaction that are within the amount of the stated available balance provided by WELLS FARGO.

i.  Whether Defendant WELLS FARGO misled customers regarding that it assessed insufficient overdraft fees for transactions it approved, and for which there were sufficient funds in the account at the time of the transaction to cover the cost of the transaction.

j.  Whether Defendant WELLS FARGO misled customers that available balance information through ATM machines, Online, Bank Statements, In-Store and Telephone is inaccurate and can result in insufficient overdraft charges for transaction that are within the amount of the stated available balance provided by WELLS FARGO.

k.  Whether Defendant WELLS FARGO'S conduct as described above constitute violations of the causes of action set forth below.;

**COUNT I**
**Violation of C.R.S. § 6-1-101 *et seq.* – Colorado Consumer Protection Act**
**(Against all Defendants)**

38.  Plaintiff re-pleads all of the foregoing allegations and alleges:

39.  Plaintiff is a consumer within the meaning of the Colorado Consumer
     Protection Act ("CPA"). Defendant is a seller within the meaning of the
     CPA.

40.  Plaintiff is engaged in consumer commerce in Colorado and has been
     affected by Defendants' deceptive business practices, in violation of
     the CPA, including: wrongfully taking overdraft fees from its Wells
     Fargo accounts, and wrongfully dishonoring checks, after debit
     transactions and ATM withdrawals and checks were presented when
     Plaintiff had sufficient funds in its checking accounts to cover these
     transactions at the time they were made; Defendants' actions include:
     increasing the likelihood of assessing these charges by identifying and
     publishing inaccurate "available balance" information to Plaintiff;
     Defendants' practice of creating a line of credit on accounts without
     the customers' knowledge, thereby permitting over-drafting from the
     account and assessing overdraft fees; and Defendants' failure to
     adequately notify Customers of these practices.

41.  As a result of Defendants' action, each Plaintiff and members of the

Classes have incurred damages in the form of insufficient funds overdraft fees, NSF return check fees being assessed and automatically withdrawn from their checking account by WELLS FARGO, and, damages from checks present against Plaintiffs' funds being wrongfully dishonored by WELLS FARGO.

42.   Plaintiff seeks judicial orders of an equitable nature against Defendants, including, but not limited to, orders declaring such practices as are complained of herein to be unlawful, unfair, fraudulent and/or deceptive and enjoining them from undertaking any further unfair, unlawful, fraudulent and/or deceptive acts or omissions.

## COUNT II
### Fraud
### (Against all Defendants)

43.   Plaintiff re-pleads all of the foregoing allegations and alleges:

44.   The misrepresentations, nondisclosure and/or concealment of material facts made by Defendants to Plaintiff, as set forth above, were known by Defendants to be false and material and were intended by the Defendants to mislead Plaintiff.

45.   That the Plaintiff reasonably relied upon the representations, non-disclosure and concealment.

46.   That the Plaintiff was actually misled and deceived and was induced by WELLS FARGO to incur overdraft charges it otherwise would not have incurred.

47.   As a result of the conduct of Defendants, Plaintiff has been damaged by having incurred unwarranted overdraft fees assessed and taken from its checking accounts; Plaintiff has also been damaged from Defendants' wrongful dishonor of its checks. In addition to such damages, Plaintiff seeks punitive or exemplary damages pursuant to C.R.S. § 13-21-102 (2009), in that defendants engaged in "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant[s] with the intention on the part of the defendant[s] of thereby depriving a person of property or legal rights or otherwise causing injury."

**COUNT III**
**Negligent Misrepresentation**
**(Against all Defendants)**

48.   Plaintiff re-pleads all of the foregoing allegations and alleges:

49.   That Defendants had a duty to provide honest and accurate information to its customers, including the Plaintiff, to avoid those customers from incurring expensive and unnecessary overdraft charges.

20

50.   Defendants specifically and expressly indicated to class members that Wells Fargo's customers' checking account balance or available balance that are published online, by phone, by ATM machines, and in-store inquiries are accurate and reliable, when in fact they are inaccurate and unreliable.

51.   Such misrepresentations were and are made by WELLS FARGO through the use of the identifying term "available balance" in the various methods in which customers may access their checking account information, when in fact such information is not what it purports to be, and through the various marketing materials and the customer agreement contracts (examples of all of which are set forth in the "Factual Allegations" set forth above or below).

52.   Defendants knew, or in the exercise of reasonable diligence should have known, that the ordinary customer of Defendants' products would understand Defendants' representations concerning the terms "account balance" or "available balance" as being what they purport to be – the actual available balance at the time of the inquiry. Defendants also knew or in the exercise of reasonable diligence, should have known because they are experts in their industry, that the ordinary customer of Defendants' products would understand the marketing materials and the terms of the customers agreement

contracts set forth in this Complaint as indicating that the published "account balance" or "available balance" are accurate and reliable. Any other understanding on the part of consumers would not be reasonable given Defendants' representations.

53.   Plaintiff justifiably relied on Defendants' misrepresentation as to their available balance and engaged in debit transactions or ATM withdrawals, and issued checks which were within the limits of their published "available balance," yet were assessed overdraft fees as much as $70.00 per check.

54.   As a result of the conduct of Defendants, Plaintiff has  been damaged by having relied on Defendants' misrepresentations as to its available balance and have incurred unwarranted overdraft fees

55.   In addition, by representing and posting pending charges to online accounts in real time, and then including those charges to provide available balance, WELLS FARGO represented to Plaintiff that overdraft fees would not be charged for transactions that were less than the balance in the account at the time the transaction took place.

56.   Those representations were false as Defendants did assess and automatically deduct overdraft fees from Plaintiffs' account even

though there was funds available to cover the transaction at the time of the transaction.

57. Defendants knew, or in the exercise of reasonable diligence should have known because of their expertise in the industry, the Plaintiff and ordinary customers would rely on those representations.

58. That Plaintiff did reasonably rely on those representations

59. As a result, Plaintiff has been damaged by being assessed expensive and unnecessary and unconscionable overdraft fees

**COUNT IV**
**Conversion**
**(Against all Defendants)**

60. Plaintiff re-pleads all of the foregoing allegations and alleges:

61. Plaintiff own and has the right to possess the money that is in its checking accounts.

62. Defendants interfered with Plaintiff's and possession of this money by wrongfully taking directly from their checking accounts overdraft fees after check card, debit card transactions, check transactions or ATM withdrawals, despite the fact that Plaintiff had sufficient funds in its accounts to cover these transactions at the time they were made, and

that it relied on the available balance information provided by Defendants.

63.   Plaintiffs never consented to Defendants directly taking overdraft fees from their checking accounts as a result of debit card transactions or ATM withdrawals or check transactions when there were sufficient funds in their accounts to cover these transactions at the time they were made.

64.   Plaintiff has been damaged by Defendants' wrongful taking of overdraft fees from its checking accounts in an amount that is capable of identification through Defendants' records.

**COUNT V**
**Violation of C.R.S. § 18-4-405. – Civil Theft**
**(Against all Defendants)**

65.   Plaintiff re-pleads all of the foregoing allegations and alleges

66.   Plaintiff has the right to possess the money that is in its checking accounts.

67.   Defendants interfered with Plaintiff's possession of this money by intentionally and wrongfully taking, directly from their checking accounts, overdraft fees after check card, debit card transactions or ATM withdrawals or check transactions, without authorization,

despite the fact that Plaintiff had sufficient funds in their accounts to cover these transactions at the time they were made, and that the Plaintiff reasonably relied on the available balance information provided by Defendants.

68. Plaintiff never consented to, or authorized Defendants directly taking overdraft fees from their checking accounts as a result of debit card transactions or ATM withdrawals or check transactions when there were sufficient funds in their accounts to cover these transactions at the time they were made.

69. Plaintiff has been damaged by Defendants' wrongful taking of overdraft fees from its checking accounts in an amount that is capable of identification through Defendants' records.

**COUNT VI**
**Breach of Contract**
**Breach of Implied Covenant of Good Faith & Fair Dealing**

70. Plaintiff re-pleads all of the foregoing allegations and alleges:

71. WELLS FARGO breached its agreements with the Plaintiff, with all subsequent amendments, supplements, novations and accords, by not honoring their commitments to the Plaintiff, and, by using Plaintiff's accounts and funds solely for its own profiteering.

72.  Plaintiff breached its express and implied covenants of good faith and fair dealing through its refusal or failure to meet its obligations under the contracts.

73.  Plaintiff has incurred damages as a result of the Defendant's breach of their obligations to deal with the Plaintiff in good faith and in a manner that is fair.

**COUNT VII**
**Price-Fixing**
**Sherman 1**
**15 U.S.C. § 1 (2009)**

**(Against all Defendants)**

74.  Plaintiff re-pleads all of the foregoing allegations and alleges, independently, or in the alternative:

75.  Defendants, by their own admission in their news release attached, are "price leaders" in the banking industry in the relevant geographic market of the United States.

76.  To compete in the market, effectively, other national banks and local banks must match the Defendants' pricing on NSF fees, and, non-price terms on NSF policies, in order to maintain their share of deposits in the United States Market, and, their profitability.

77.  Plaintiff is informed, and on that information alleges, that the national

banks in the United states are engaging in concerted action to form a contract, combination or conspiracy in restraint of trade to match the Defendants aggressive taking of NSF fees from depositors' accounts in an amount exceeding 40 Billion Dollars in the fiscal year ending 2009.

78.    Plaintiff has been damaged by these agreements or concerted action in combination or conspiracy in restraint of trade in the banking industry in the United States.

### COUNT VIII
**Attempted Monopolization**
**Sherman 2**
**15 U.S.C. § 2 (2009)**

**(Against all Defendants)**

79.    Plaintiff re-pleads all of the foregoing allegations and alleges, independently, or in the alternative:

80.    By its own admission in the news release attached to this Complaint, the Defendants have the largest market share of deposits in the United States, including, but not limited to, the largest market share of deposits in 39 states and the District of Columbia.

81.    By its actions in aggressively luring depositors away from its competitors in the banking industry in the United States, and, then aggressively dominating the resulting deposits it controls, the

Defendants have a dangerous probability of achieving a monopoly in the United States of depositors' funds, or, a monopoly-in-fact, over the discrete portion of what the United States Federal Reserve Bank designates the M-1 money supply of the United States.

82.   Plaintiff believes that the Defendants are using their aggressive taking of funds from depositors accounts, such as the Plaintiff's accounts, to police and promote their objective of monopolizing the control over depositors' share of M-1.

83.   Plaintiff has been damaged by the Defendants predatory and monopolistic conduct in the banking industry in the United States.

84.   The foregoing acts of the Defendants are illegal *per se* under the Antitrust laws of the United States.

WHEREFORE, Plaintiffs ask this Court for relief as follows:

1.   Actual economic damages resulting from the Defendants' acts and omissions;

2.   Actual non-economic damages resulting from the Defendants' acts and omissions;

3.   Reasonable interest from the date of the transaction in the Complaint;

4.   Attorney's Fees;

5.   Treble damages;

Such further relief as the Court deems just and fair.

Plaintiff demands trial by jury.

Respectfully Submitted,
PRESTON & ASSOCIATES

s/ James E. Preston
James E. Preston  #20578
Preston & Associates
25020 Highway 145
Dolores, CO  81323
(970)-882-4245
Fax:  800-807-5207
jep@prestonlaw.us
Attorneys for the Plaintiff

Case 1:10-cv-20913-JLK    Document 1    Entered on FLSD Docket 12/17/2009    Page 30 of 31



## News Release

**Wells Fargo and Wachovia Merger Completed**

*Creating North America's Most Extensive Financial Services Company, Coast-to-Coast in Community Banking*

San Francisco — January 1, 2009

Wells Fargo & Company (NYSE: WFC) said today it has completed its merger with Wachovia Corporation, effective December 31, 2008, creating North America's most extensive distribution system for financial services with 11,000 stores, 12,260 ATMs, wellsfargo.com and Wells Fargo PhoneBankSM. Beginning today, Wells Fargo and Wachovia customers have free use of all of the company's combined ATMs.

Wells Fargo now has community banks in 39 states and the District of Columbia and is #1 in deposit market share in 18 of those states plus the District of Columbia.* It also is #1 in the U.S. in community banking presence (6,650 stores), small business lending, middle market commercial banking, agriculture lending, commercial real estate lending, commercial real estate brokerage, and bank-owned insurance brokerage. It is #2 in banking deposits in the U.S., home mortgage originations and servicing, retail brokerage (number of financial advisors), and debit card. Wells Fargo is one of America's largest private employers with 276,000 team members.

"This merger creates what we believe will be a very compelling value proposition for our team members, customers, communities and shareholders with significant potential for even more market share growth," said Wells Fargo President and CEO John Stumpf. "Our team members can benefit from even more professional development opportunities across a much broader geography. Our customers can benefit from greater convenience and a better value for entrusting us with more of their business. Our communities can benefit because we want to be a leading contributor of financial, human and social capital in every community in which we do business. Our shareholders can benefit because of the exciting growth opportunities created by this merger. We're being very thoughtful and deliberate in our three-year merger integration. Just as we did with the very successful Norwest-Wells Fargo merger integration a decade ago, we'll take the time to do it right for our customers, always putting their interests first by seeking to satisfy all their financial needs and helping them succeed financially."

Pat Callahan, an executive vice president and head of the Company's merger transition, said Wachovia customers will continue to see the Wachovia brand in their banking stores and communities for the near future. "The key to a successful integration will be our ability to provide outstanding customer service throughout the integration," said Callahan. "So we're going to take our time and do this right. Wells Fargo and Wachovia customers should continue banking as they do today — using the same bank accounts, payment coupons, online sign-on, credit cards, ATM cards and check cards, checks and banking stores. We're committed to keeping customers informed of all significant changes before they happen."

At closing, Wells Fargo acquired all outstanding shares of common stock of Wachovia in a stock-for-stock transaction. Wachovia shareholders received 0.1991 shares of Wells Fargo common stock in exchange for each share of Wachovia common stock they owned. Shares of each outstanding series of Wachovia preferred stock were converted into shares (or fractional shares) of a corresponding series Wells Fargo preferred stock having substantially the same rights and preferences. As a result of the transaction, Wells Fargo acquired all of Wachovia Corporation and its businesses and obligations, including all of its banking deposits.

With Wachovia, Wells Fargo for the first time has a Community Banking presence in Alabama, Connecticut, Delaware, Florida, Georgia, Kansas, Maryland, Mississippi, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Tennessee, Virginia and Washington D.C.

Wachovia's stock symbol "WB" was retired effective December 31, 2008. Wells Fargo stock trades under the symbol WFC. For more information about the merger, visit www.wellsfargo.com.

Wells Fargo & Company is a diversified financial services company with $1.4 trillion in assets, providing banking, insurance,

Case 1:10-cv-20913-JLK    Document 1    Entered on FLSD Docket 12/17/2009    Page 31 of 31

investments, mortgage and consumer finance through almost 11,000 stores and the internet (wellsfargo.com) across North America and internationally. Wells Fargo Bank, N.A. has the highest possible credit rating, "Aaa," from Moody's Investors Service and the highest credit rating given to a U.S. bank, "AA+," from Standard & Poor's Ratings Services.

* Deposit data as of June 30, 2008 (pro forma for acquisitions; excludes deposits greater than $500mm in a single banking store.)

###

© 1999 - 2009 Wells Fargo. All rights reserved.